UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 23-CR-10269-AK

UNITED STATES OF AMERICA

v.

CARLOS LOPEZ

## ORDER DENYING THE GOVERNMENT'S MOTION TO RECONSIDER DETENTION

LEVENSON, M.J.

## I.     Introduction

I ordered Defendant released on conditions on October 13, 2023. Docket No. 24. As I knew and considered at the time of the decision to release, Defendant is a Guatemalan national without legal status in the United States. *See* Docket No. 38, at 2. In light of his circumstances, I ordered a variety of highly restrictive conditions that appeared to me sufficient to reasonably ensure the safety of the public and to assure Defendant's appearance at trial.

After his release on October 13, Defendant was taken into custody by U.S. Immigration and Customs Enforcement ("ICE").[1] *See id.* Defendant had an initial hearing before an immigration judge on November 6, 2023, where, according to the government, Defendant

---

[1] Defendant's counsel has submitted an affidavit that indicates Defendant was released from the custody of the U.S. Marshal and, once at liberty, was subsequently detained by the U.S. Marshals Service for the stated purpose of holding him until ICE could take him into custody. Docket No. 42-1, at 1–2. The precise circumstances under which Defendant came to be in ICE custody are not currently before the Court. As a practical matter, it may have made sense for Defendant to wait at the Courthouse, in light of the impending arrival of ICE agents. But it is not apparent that the U.S. Marshals Service had the authority to detain Defendant on its own initiative. *See* Docket No. 42, at 6 n.6.

accepted an order of removal and waived his right to appeal.[2] *Id.* On November 12, 2023, the government filed the instant motion, seeking Defendant's detention to prevent him from being removed from the country before the charges pending in this case are resolved. Docket No. 38.

The government contends that Defendant "took steps . . . to expedite his removal from the United States" by not contesting or appealing his order of removal and argues that Defendant's impending deportation means that no conditions of release can reasonably assure his appearance for trial, thus requiring his detention. *Id.* at 3.

Defendant counters that he has no control over ICE's decision to seek his removal and, furthermore, that he has no viable defense to the removal order. *See* Docket No. 42, at 6–7. Defendant asserts that he has taken no affirmative act to encourage ICE to remove him from the country. *Id.* at 2. Defendant argues that it would be unfair and improper to order him detained based on a risk of non-appearance, when such nonappearance would be involuntary (on his part) and would be entirely caused by ICE, an agency of the executive branch of the United States government. *Id.* at 6. Defendant argues that the detention statute, 18 U.S.C. § 3142 (which I will also refer to as the Bail Reform Act, or "BRA") does not authorize courts to consider the risk that the government itself will cause a Defendant's nonappearance as a basis for detention. *Id.* at 4.

---

[2] At oral argument on this motion, the government did not identify any particular action Defendant may have taken, or failed to take, during the immigration hearing that resulted in the order of removal and the waiver of his appellate rights. There is no information before the Court about what occurred during the immigration hearing, and it is not clear what Defendant may have understood about the nature of the ICE hearing or about the relationship between his obligation to appear before this Court and ICE's apparent desire to deport him. Defendant is represented by appointed counsel in this matter, but there is nothing before the Court to suggest that he was assisted by counsel during his immigration hearing. Defendant does not speak English, and the Court notes that his counsel has suggested that Defendant may be unable to read or write in his native language.

I am persuaded that the BRA does not authorize detention based on a risk that Defendant will not appear for reasons beyond his control. I therefore deny the government's motion. I also find, as an independent ground for my denial of the government's motion, that the BRA does not authorize a court to detain a person for the purpose of thwarting ICE's exercise of its authority under the Immigration and Nationality Act ("INA") to detain and deport persons who are without legal status in the United States. *See* 8 U.S.C. § 1231 ("Detention and removal of aliens ordered removed").

## II.    Legal Standard

The BRA provides that a Court may detain a defendant pending trial if the government shows either (a) that the defendant poses a danger to the community and, by clear and convincing evidence, that no set of conditions can reasonably ensure the safety of the community or (b) that there is a serious risk the defendant will flee and, by a preponderance of the evidence, that no set of conditions can reasonably assure defendant's appearance. *See* 18 U.S.C. § 3142(e), (f); *United States v. Patriarca*, 948 F.2d 789, 792–93 (1st Cir. 1991). Under the BRA, a detention hearing "may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2).

### III.   Analysis

#### a. *Risk of Nonappearance*

For the reasons discussed below, I am unpersuaded by the Government's contention that the prospect that ICE may deport Defendant constitutes "a serious risk that such person will flee," within the meaning as that term as used in the BRA. Accordingly, I conclude that the BRA does not authorize me to detain Defendant simply because ICE might remove him from this country before the conclusion of this criminal case. An ICE order of removal does not implicate the type of volitional nonappearance that can justify detention under the BRA and Defendant has not himself evinced any intention to flee the Court's jurisdiction.

#### i. *Nonappearance Under the BRA Refers to Volitional Conduct*

The central question is whether the risk of nonappearance referenced by 18 U.S.C. § 3142(e)(1) and (f) refers to an intentional choice not to appear, or whether it extends to the risk that the government itself might cause a defendant to be absent from court.

By its literal terms, the BRA's language about reasonably assuring a defendant's appearance could conceivably be read to comprehend the risk that a defendant might be absent from court for any reason whatsoever. *See* 18 U.S.C. § 3142(f) ("The judicial officer shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community").

If, however, risk of nonappearance under the BRA is understood to include an element of volition, then the prospect that Defendant may soon be involuntarily deported by ICE does not amount to a cognizable risk of nonappearance within the meaning of the BRA. This, I think, is the better reading of the statute.

I am guided by decisions from several courts of appeals, who have ruled in various contexts that the BRA does not authorize detention of defendants merely because they might be unable to appear due to circumstances beyond their control. *See, e.g.*, *United States v. Storme*, 83 F.4th 1078, 1083 (7th Cir. 2023) ("In the bail context, nonappearance refers to an attempt to avoid submitting to a court's jurisdiction, not to death. . . . Consider the practical implications of a contrary conclusion. If a defendant's death constituted a form of nonappearance, judges could detain upon a showing of a sufficient risk of death, including one created by age, poor health, or inadequate access to medical services."); *United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015) ("[T]he risk of nonappearance referenced in 18 U.S.C. § 3142 must involve an element of volition."); *United States v. Ailon-Ailon*, 875 F.3d 1334, 1337 (10th Cir. 2017) ("We agree with the latter set of courts that a risk of involuntary removal does not establish a 'serious risk that [the defendant] will flee' upon which pre-trial detention may be based." (alteration in original) (quoting 18 U.S.C. § 3142(f)(2)(A))).

To be sure, there are contrary rulings. Some district courts have held that risk of nonappearance under the BRA extends to non-volitional absences from court, such as deportation. *See Ailon-Ailon*, 875 F.3d at 1337 (holding that a risk of involuntary deportation does not justify detention under the BRA, but collecting contrary cases); *see also* Docket No. 38, at 3 (collecting cases). I have not identified any federal *appellate* decisions that adopt this interpretation.

I am persuaded by the reasoning followed by the courts that have concluded that involuntary deportation – by itself – does not justify detention simply because it would cause the defendant to be absent from court. These courts have concluded that the kind of nonappearance with which the BRA is concerned is volitional nonappearance. *See Ailon-Ailon*, 875 F.3d at 1337

("[A] risk of involuntary removal does not establish a 'serious risk that [the defendant] will flee' upon which pre-trial detention may be based." (alteration in original) (quoting § 3142(f)(2)(A))); *Santos-Flores*, 794 F.3d at 1089 ("We hold that the district court erred in ordering pretrial detention based on the likelihood that, if released pending trial, Santos–Flores would be placed in immigration detention and removed from the United States, precluding his appearance for trial.").

These holdings are grounded in the language and structure of the BRA. As the Ninth Circuit explained in *Santos-Flores*, the BRA contains a tailored procedure for temporary detention of persons who lack legal status in the United States. The procedure applies only if those defendants are likely to flee or pose a danger, which are both volitional acts. The court expressly noted that there is no provision for the lengthier detention of such a person under the BRA:

> The factors that a court should consider in determining whether a particular defendant should be released under pretrial supervision or confined pending trial are set forth in 18 U.S.C. § 3142(g), and immigration status is not a listed factor. Alienage may be taken into account, but it is not dispositive.
>
> Congress chose not to exclude removable aliens from consideration for release or detention in criminal proceedings. The Bail Reform Act does, however, provide specific procedures to be followed when a judicial officer determines that a defendant is not a citizen of the United States or lawfully admitted for permanent residence. The judicial officer must determine whether such an alien may flee or pose a danger to any other person or the community. If so, the judicial officer shall order temporary detention for not more than ten days, and direct the attorney for the government to notify "the appropriate official of the Immigration and Naturalization Service." A determination that the alien may flee or pose a danger— voluntary acts—is required to impose even this temporary detention. If the immigration official does not take custody of the defendant during that ten-day period, Congress directs the court to treat the defendant in accordance with the other provisions of the Bail Reform Act, "notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings."

*Santos-Flores*, 794 F.3d at 1090–91 (footnotes omitted) (citations omitted) (quoting 18 U.S.C.

§ 3142(d)). As the Ninth Circuit's observations underscore, Congress has provided a specific

procedure for addressing immigration considerations within the operation of the BRA. This

militates against a reading that would find in the BRA a broad authorization for the court to

intrude into the statutory regime applicable to deportation proceedings (*i.e.*, the INA). A fair

implication of these special procedures is that the court should proceed as usual under the BRA,

if ICE does not take custody of a defendant who lacks legal status to remain in the United States.

     The Tenth Circuit's examination of the BRA's language is also notable. Looking to the

same provision examined by the Ninth Circuit in *Santos-Flores*, the Tenth Circuit concluded that

this "provision demonstrates that a defendant 'is not barred from release because he is a

deportable alien.'" *Ailon-Ailon*, 875 F.3d at 1338 (quoting *United States v. Adomako*, 150 F.

Supp. 2d 1302, 1307 (M.D. Fla. 2001)). The Tenth Circuit further pointed out that the BRA's

inclusion of an affirmative defense to a charge of failure to appear demonstrates that, when

referring to failures to appear in the BRA, Congress meant only volitional failures:

> [T]he Bail Reform Act provides an affirmative defense to prosecution for failure to appear if "uncontrollable circumstances prevented the person from appearing or surrendering, and . . . the person did not contribute to the creation of such circumstances in reckless disregard of the requirement to appear or surrender." § 3146(c). This section implies that the Act is concerned with "the risk that the defendant may flee or abscond, that is, that he would fail to appear by virtue of his own volition, actions and will." [*United States v. Montoya-Vasquez*, No. 4:08CR3174, 2009 WL 103596, at *5 (D. Neb. Jan. 13, 2009)].

*Id.* at 1339.

     The District Court for the District of Nebraska has succinctly recapped the argument that

the BRA does not authorize detention of defendants based solely on the prospect that they may

be deported:

> If the court could consider as determinative the speculative probabilities that a defendant would be removed from this country by ICE once he is placed in ICE

custody, it would effectively mean that no aliens against whom ICE places detainers could ever be released on conditions. Such a harsh result is nowhere expressed or even implied in the Bail Reform Act. Instead, the Act simply requires temporary detention and the giving of notice by the court to immigration officials so they can investigate and determine whether they wish to pursue filing a detainer against the alien defendant. 18 U.S.C. § 3142(d)(1)(B). If Congress wanted to bar aliens with immigration detainers from eligibility for release, it could readily have said so, but did not.

*Montoya-Vasquez*, 2009 WL 103596, at *5.

I conclude that the risk that Defendant will be deported and thus involuntarily be made absent from court does not constitute a serious risk of flight as that term is used in the BRA. Accordingly, the government's representation that Defendant faces imminent deportation does not, by itself, warrant his detention under the BRA.[3]

### ii.   The Voluntariness of Defendant's Deportation

Having concluded that the impending prospect of deportation cannot, standing alone, support a finding of a risk of nonappearance, I must determine whether Defendant has volitionally sought to avoid appearing. The government has argued that Defendant, by failing to contest or appeal his order of removal, has taken a volitional step towards leaving the country and avoiding the Court's jurisdiction. I am not persuaded.

The government points me to the decision of another Magistrate Judge in this Court, in *United States v. Guzman*, No. 20-CR-10004-DJC (D. Mass. Feb. 25, 2020). In that case, the Magistrate Judge revoked, under the BRA, the release of a defendant who had requested a voluntary departure (*i.e.*, a release from ICE custody to allow her to arrange her own travel out of

---

[3] The court may, of course, consider a defendant's immigration status in determining whether the defendant might flee. For defendants who face a virtual certainty of deportation following a substantial prison sentence, there is an obvious motivation to flee to their countries of origin rather than wait to serve a sentence in the United States and then be deported. Such facts speak to the likelihood that a defendant will flee intentionally and to the conditions of release that might mitigate such a risk.

the country) at her initial hearing before an immigration judge. *See Guzman,* No. 20-CR-10004-DJC, Docket No. 55, at 1. Ultimately, the immigration judge denied Ms. Guzman's request for voluntary departure and ordered her removed, but, prior to her removal, the district court allowed the government's motion for detention under the BRA, finding that there were no conditions that could reasonably assure Ms. Guzman's appearance. *Id.* at 2–3.

*Guzman* stands on a different footing than the present case. Critically, Ms. Guzman affirmatively requested that the immigration court permit her to leave the country, thus "express[ing] a clear intention to avoid her criminal case if at all possible." *Id.* at 3. The court in *Guzman* noted that "[c]ourts are divided on whether a strong likelihood of deportation should be a critical factor in deciding whether there are conditions that can be set which would reasonably insure the defendant's appearance at trial," but explained that, "[g]iven the unique facts of [the] case, [the] court does not need to wade into this dispute, and elects not to do so." *Id.* at 2–3.

The key factor in *Guzman*, which is not present in this case, was that Ms. Guzman had expressed her intent to flee by requesting a voluntary departure. This volitional act underlay the decision to revoke Ms. Guzman's release and allowed the court in *Guzman* to decide the matter without having to "wade into" interpretative questions about whether the BRA authorizes detention in the absence of any risk of volitional efforts to flee. *Id.* at 3 ("[T]he defendant . . . attempted to obtain a voluntary departure from the United States. She has expressed a clear intention to avoid her criminal case if at all possible.").

In the present case, the parties' factual representations provide no foundation upon which I could find that Defendant has taken any volitional step to avoid appearing for trial, or that Defendant intends to do so. I cannot find that Defendant volitionally sought to leave the jurisdiction. Indeed, it is unclear whether Defendant actually said or did anything at all during his

immigration hearing. As for the government's contention that he should have actively opposed his removal, there is nothing in the record to contradict Defendant's counsel's representation that Defendant has no cognizable defense to removal, so that any such challenge would have been frivolous.[4] *See* Docket No. 42, at 7.

The executive branch, through ICE, has set in motion Defendant's removal from the country. Defendant neither asked nor chose to be placed into removal proceedings. The government now seeks Defendant's detention under the BRA but is unable to identify any word or deed by which Defendant could be said to have volitionally sought to leave the country. Defendant's failure to object to the ICE removal decision doesn't fit the bill, particularly since there is no suggestion that Defendant has any valid objection to his deportation.

Accordingly, I find that the government has not met its burden to show by a preponderance of the evidence that there are no conditions of release that will reasonably assure Defendant's appearance, as those terms are used in the BRA. There are no grounds for revoking Defendant's release at this time.

### b. The BRA Does Not Authorize Courts to Thwart the Enforcement of the INA

A separate, but complementary, basis for my denial of the government's motion is that the BRA does not authorize me to detain a defendant for the sole purpose of interfering with ICE's enforcement of the INA. As Judge Casper of this Court has observed, "it is perhaps an unusual situation where the U.S. Attorney's Office, having indicted a defendant, runs the risk that he will be removed by ICE before the conclusion of their prosecution. Such scenario,

---

[4] Notably, there is no representation that he requested a voluntary departure – or did anything, for that matter – at his initial hearing.

however, is not barred by the BRA or any intersection with the INA." *United States v. Alzerei*, No. CR 19-10124-DJC, 2019 WL 2642824, at *3 (D. Mass. June 27, 2019).

The government agreed, at the hearing on its motion, that this Court lacks authority to interfere with ICE's execution of its mandate under the INA. This is well settled. When district courts have been asked to interfere with ICE's detention or deportation of criminal defendants in reliance on the BRA, appellate courts have repeatedly found such interference to be an overreach. *See, e.g.*, *United States v. Barrera-Landa*, 964 F.3d 912, 923 (10th Cir. 2020) ("[S]imply put, the [BRA] does not preclude INA removal." (second alteration in original)); *United States v. Vasquez-Benitez*, 919 F.3d 546, 552–53 (D.C. Cir. 2019) (holding that there is no constitutional or statutory conflict between the BRA and the INA and finding that "ICE's authority to facilitate an illegal alien's removal from the country does not disappear merely because the U.S. Marshal cannot detain him under the BRA pending his criminal trial"); *United States v. Veloz-Alonso*, 910 F.3d 266, 270 (6th Cir. 2018) (reversing a district court's order preventing the government from detaining or deporting a defendant prior to sentencing, and holding that "ICE may fulfill its statutory duties under the INA to detain an illegal alien pending trial or sentencing regardless of a BRA release determination"); *United States v. Lett*, 944 F.3d 467, 472–73 (2d Cir. 2019) ("[Immigration] regulations merely prohibit aliens who are parties to a criminal case from departing from the United States voluntarily; they do not affect the government's authority to deport such aliens pursuant to final orders of removal."); *United States v. Soriano Nunez*, 928 F.3d 240, 247 (3d Cir. 2019) (holding that a release order under the BRA does not mandate release from ICE detention).

The cases I cite here generally concern whether district courts may issue orders under the BRA that trump civil detention and deportation decisions made by immigration judges under the

INA. But the reasoning extends to the present case. If this Court were to detain Defendant based solely on the prospect that he would be deported by ICE if he were not detained, the Court would be using the BRA to inhibit ICE's enforcement of the INA.

Although the relief the government seeks would not take the form of an injunction, a detention order would yield much the same result: ICE would be prevented from deporting Mr. Lopez for the immediately foreseeable future. Absent some appropriate basis for detention under the BRA, it would seem an abuse of discretion to use the BRA for the sole purpose of thwarting enforcement of the INA.

Ultimately, the issue here is not really one for the Court. It is a matter for two agencies of the Executive Branch to sort out. As one district judge wrote in a similar (but not identical) circumstance:

> The problem here is not that defendant will absent himself from the jurisdiction, but that two Article II agencies will not coordinate their respective efforts. The Executive, in the person of the Attorney General, wishes to prosecute defendant. The same Executive, in the person of the Assistant Secretary of Homeland Security for ICE, may want to deport him. It is not appropriate for an Article III judge to resolve Executive Branch turf battles. The Constitution empowers this Court to apply the will of Congress upon a criminal defendant on a personal and individualized basis. This Court ought not run interference for the prosecuting arm of the government.

*United States v. Barrera-Omana*, 638 F. Supp. 2d 1108, 1111–12 (D. Minn. 2009).

## IV.   Conclusion

For the reasons set forth above, I deny the government's motion.[5]


Date: November 20, 2023

/s/  Paul G. Levenson
United States Magistrate Judge

---

[5] The parties are advised that under Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party seeking review by a district judge of the determination(s) and order(s) set forth herein must serve and file any objections within fourteen days of being served a copy of this order, unless a different time is prescribed by the magistrate judge or the district judge. Such objections must specifically designate the order or part thereof to be to be modified or set aside and the basis for objection. The district judge will set aside any portion of the magistrate judge's order that is found to be clearly erroneous or contrary to law. The parties are further advised that failing to follow the objection procedures of Rule 2(b) may preclude further appellate review. *See Phinney v. Wentworth Douglas Hospital,* 199 F.3d 1, 4 (1st Cir. 1999); *Sunview Condo. Ass'n v. Flexel Int'l*, 116 F.3d 962, 964–65 (1st Cir. 1997).